**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JACK L. AUSMAN,**

                                        **Plaintiff,**

          **vs.**                                        **6:13-cv-00442**
                                                         **(MAD)**

**CAROLYN W. COLVIN,**
*Acting Commissioner of Social Security*,

                                        **Defendant.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

**OLINSKY LAW GROUP**                    **HOWARD D. OLINKSY, ESQ.**
300 S. State Street
Suite 420
Syracuse, New York 13202
Attorneys for Plaintiff

**SOCIAL SECURITY ADMINISTRATION**      **EMILY M. FISHMAN, ESQ.**
Office of General Counsel
26 Federal Plaza, Room 3904
New York, New York 10278
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On April 28, 2009, Plaintiff filed an application for supplemental security income ("SSI").

*See* Administrative Record ("R.") at 120, 245. On June 20, 2009, Plaintiff's claim was initially

denied and, after a hearing, the claim was denied by an Administrative Law Judge ("ALJ") on

August 23, 2010. *See id.* at 54, 138-45. On August 19, 2011, the Appeals Council remanded the

matter back to an ALJ. *See id.* at 150-54. After another hearing, the ALJ denied Plaintiff's

application. *See id.* at 16-29.

Currently before the Court are the parties' cross-motions for judgment on the pleadings. *See* Dkt. Nos. 11, 13.

## II. BACKGROUND

On the application date of April 28, 2009, Plaintiff was thirty-nine years old. *See* R. at 245. Plaintiff reported an eleventh grade education and past work as a food preparer/cook, farm laborer, gas station attendant, and groundskeeper. *See id.* at 84, 297.

On July 1, 2008, Plaintiff treated with Brian J. Berry, RPA ("P.A. Berry"), and Rudolph A. Buckley, M.D., at Slocum-Dickson Medical Group for an orthopedic consultation related to his left lower lumbar pain. *See id.* at 372. They noted an MRI of the lumbar spine revealed "decreased T2 signal L4 to S1, significant narrowing L5-S1 interspace. Mild central disk bulge L5-S1. Mild facet disease L4 to S1." *Id.* at 373. Their impression was "long-standing repetitive low back pain left-sided. Discogenic changes as probable cause for pain L4 to S1. SI joint dysfunction with tenderness. Motor weakness appears to be secondary to poor effort from pain." *Id.* Dr. Buckley and P.A. Berry planned for Plaintiff to undergo physical therapy and continue on hydrocodone, Flexeril, Cymbalta, Prilosec, and Lunesta. *See id.* at 372-73. If Plaintiff's symptoms were unrelieved, they stated that he would be a candidate for surgical intervention. *See id.* at 373.

On November 14, 2008, a discharge summary from Physical Therapist Shannon Sullivan, MSPT, indicated Plaintiff had undergone eight sessions of physical therapy between July 18, 2008 and September 22, 2008. *See id.* at 392-93. Physical Therapist Sullivan noted Plaintiff's progress as "unresolved L4-S1 [degenerative disc disease]." *Id.*

On December 2, 2008, Plaintiff treated with Sajid A. Khan, M.D., at Slocum-Dickson Medical Group per the referral of Dr. Buckley for severe low back pain. *See id.* at 369. Plaintiff reported his pain radiated to his left leg, caused numbness and weakness in both legs, and worsened with all movements including bending, twisting, and walking. *See id.* at 369. Plaintiff reported that he could comfortably sit for thirty minutes at a time, comfortably stand for fifteen minutes at a time, and that he could not bend or twist. *See id.* On examination, Dr. Khan found that Plaintiff ambulated with an obvious limp favoring the left leg because of back pain. *See id.* at 370. Patrick's test[1] revealed pain at the lower lumbar spine area. *See id.* The lumbar facet loading test was positive bilaterally. *See id.* Dr. Khan diagnosed Plaintiff with lumbar radiculopathy, lumbar spondylosis, lumbar facet arthropathy, and left SI joint arthropathy. *See id.* Dr. Khan scheduled Plaintiff for lumbar epidural steroid injections for low back pain. *See id.* Plaintiff underwent injections on December 15, 2008, December 29, 2008, February 17, 2009 and April 9, 2009. *See id.* at 376, 381, 384, 388.

On December 23, 2008, Plaintiff treated with Shafi Raza, M.D., Plaintiff's primary care physician at Family Medicine for follow-up on his chronic back pain, insomnia, and depression. *See id.* at 364, 532. On examination, Dr. Raza found Plaintiff sitting on the bed with mild distress. *See id.* at 532. There was tenderness of the left side of the lumbar side, and paraspinous was positive on the left side. *See id.* at 533. The straight leg raise test was positive on both sides. *See id.* Dr. Raza diagnosed Plaintiff with chronic back pain for which he prescribed Vicodin,

---

[1] "Patrick's test" is defined as follows: "With the patient supine, the thigh and the knee are flexed and the external malleolus is placed over the patella of the opposite leg; the knee is depressed, and if pain is produced, arthritis of the hip is indicated." *Dorland's Illustrated Medical Dictionary*, at 1896 (32d ed. 2007).

Flexeril, and Lyrica. *See id.* at 553. Dr. Raza also prescribed Plaintiff Lunesta for insomnia. *See id.*

On February 13, 2009, Plaintiff treated with Dr. Khan for severe low back pain that he described as constant, sharp, grinding, stabbing and an eight out of ten on the pain scale with radiation to the left leg. *See id.* at 364. Plaintiff reported the epidural steroid injections had worked for a few days but the pain would come back. *See id.* Dr. Khan noted that Plaintiff had been walking with a cane and antalgic gait. *See id.* Dr. Khan's examination findings were the same as Plaintiff's treatment from December 2, 2008, except Dr. Khan additionally found that Plaintiff had "moderate to severe tenderness of lumbar paraspinal muscles and left SI joint. *See id.* at 365. Dr. Khan diagnosed Plaintiff with lumbar radiculopathy, lumbar spondylosis, lumbar facet arthropathy, and possible left SI joint arthropathy. *See id.* Dr. Khan noted that he would try another series of epidural steroid injections for pain in the back and leg, and referred him to Dr. Buckley for surgical options. *See id.*

On March 13, 2009, Plaintiff treated with Dr. Khan for severe low back pain. *See id.* at 361. Plaintiff reported difficulty walking and standing due to lumbosacral junction pain. *See id.* Dr. Khan noted that Plaintiff's primary care physician Dr. Raza had prescribed Plaintiff Cymbalta for depression and pain medications (hydrocodone and Flexeril) which Plaintiff claimed did not provide satisfactory relief of his back pain. *See id.* at 362. Dr. Khan diagnosed Plaintiff with lumbar facet arthropathy, lumbar radiculopathy, lumbar spondylosis, and left SI joint arthropathy. *See id.* Dr. Khan recommended Plaintiff undergo diagnostic lumbar medial branch blocks to see if the pain was caused by lumbar facet arthropathy. *See id.*

On May 6, 2009, Plaintiff treated with Dr. Khan for low back pain that radiated to his left leg. *See id.* at 503. Plaintiff reported that neither the diagnostic medial branch blocks nor the

lumbar epidural steroid injections provided him satisfactory relief of back and leg pain. *See id.* Plaintiff further reported that his pain medications were not helping him. *See id.* Dr. Khan noted that Plaintiff continued to walk with a cane and noted a limp. *See id.* at 503-04. On examination, Dr. Khan found that Plaintiff was unable to heel and toe walk due to pain. *See id.* at 504. There was moderate to severe superficial tenderness of the lumbar paraspinal muscles and gluteal muscles. *See id.* Range of motion in the lumbar spine was limited in flexion, extension, lateral bending and rotation due to pain. *See id.* The Patrick's test revealed pain at the lower lumbar spine area and the lumbar facet loading test was positive bilaterally. *See id.* Dr. Khan noted an MRI revealed "decreased T2 signal L5 to S1 with associated facet disease. Small disk herniation L5-S1 minimally touching the left S1 nerve root." *Id.* Dr. Khan diagnosed Plaintiff with lumbar facet arthropathy, lumbar radiculopathy, and lumbar spondylosis. *Id.* Dr. Khan noted that Plaintiff was not responding to interventional pain procedures, so he recommended a follow up with Dr. Buckley for possible surgery. *See id.* Dr. Khan started Plaintiff on Ultram for his back and leg pain. *See id.*

On May 21, 2009, Plaintiff treated with Uma Mannava, M.D., for an updated psychiatric evaluation related to Plaintiff's diagnoses of "mood disorder secondary to medical problems, PTSD, [and] [r]ule out major depression recurrent." *Id.* at 467-68. Plaintiff reported his history of growing up in foster care and his struggles resulting from being molested by his uncle. *See id.* Plaintiff reported having severe problems with getting frustrated, being angry all of the time, and losing control easily. *See id.* On examination, Dr. Mannava noted that Plaintiff loses control easily, is impulsive and that he "has no insight and lacks judgment." *Id.* at 468. Dr. Mannava diagnosed Plaintiff with, among other things, mood disorder secondary to medical problems, PTSD, a learning disability and could not rule out major recurrent depression. *See id.* Dr.

Mannava noted that Plaintiff was being prescribed Cymbalta and Lunesta from his primary care physician and advised Plaintiff that he should engage in counseling and that he "needs to be consistent in coming for counseling." *Id.* Dr. Mannava had no other suggestions for Plaintiff at that time. *See id.*

On June 4, 2009, Plaintiff was again seen by Dr. Khan. Plaintiff complained of severe low back pain (9/10) that radiated to his lower extremities, causing him to have difficulty getting out of bed, numbness in his left leg, weakness in both of his legs, and difficulty walking. *See id.* at 500. Dr. Khan again diagnosed Plaintiff with lumbar facet arthropathy, lumbar radiculopathy, and lumbar spondylosis. *See id.* at 501. Dr. Khan referred Plaintiff to Lev Goldnier, M.D., for evaluation and EMG of the legs to rule out active denervation or central nervous system pathology due to Plaintiff's difficulty with walking. *See id.*

On June 5, 2009, Plaintiff presented to Kristen Barry, Ph.D., for a consultative psychiatric evaluation. *See id.* at 433. On examination, Dr. Barry found Plaintiff cooperative, and that his mood "appeared somewhat helpless, easily frustrated, and dysthymic." *Id.* at 435. Dr. Barry estimated that Plaintiff's intellectual functioning was in the borderline to low average range, and found Plaintiff's insight and judgment to be poor. *See id.* Dr. Barry diagnosed Plaintiff with, among other things, depressive disorder not otherwise specified, PTSD, and personality disorder not otherwise specified. *See id.* at 436. Dr. Barry indicated that Plaintiff's prognosis was guarded, that he would need assistance in managing his funds, and that he could follow and understand simple directions and instructions and was "able to maintain his attention and concentration fair." *Id.*

Also on June 5, 2009, Plaintiff presented to Kalyani Ganesh, M.D. for an internal medicine consultative examination per the referral of the Division of Disability Determination.

*See id.* at 438.  On examination, Dr. Ganesh found that Plaintiff had a limp favoring the left, could not walk on his heels or toes, could not squat, and used a cane.  *See id.* at 439.  Dr. Ganesh further found that Plaintiff had a limited range of motion in the lumbar spine, hip, and knee, and that Plaintiff had tenderness in the lumbar spine.  *See id.* at 440.  She diagnosed Plaintiff with chronic lower back pain, degenerative disk disease (L4-S1), and herniation (L5-S1).  *See id.*  Dr. Ganesh indicated that Plaintiff's prognosis was guarded, and that Plaintiff had "no gross limitation to sitting or the use of upper extremities.  Moderate degree of limitation to standing, walking, climbing, lifting, carrying, pushing, pulling, and bending."  *Id.* at 441.

On June 15, 2009, Plaintiff treated with Dr. Raza for chronic back pain, insomnia, and depression.  *See id.* at 528.  On examination, Dr. Raza found Plaintiff had neck pain and tenderness in the lumbar region with decreased range of motion.  *See id.*  Plaintiff's straight leg test was positive "with giving him pain on the lumbar area."  *Id.*  Dr. Raza prescribed Vicodin, Lunesta, and Cymbalta.  *See id.*

On June 18, 2009, Plaintiff treated with Licensed Clinical Social Worker Annette Edwards for his recurrent major depressive disorder.  *See id.* at 472.  Plaintiff reported isolating himself and continued anger issues which included threatening others.  *See id.*  Ms. Edwards assessed Plaintiff as continuing to struggle with pain and anger.  *See id.*

On August 11, 2009, Plaintiff treated with Dr. Khan for severe low back pain that was constant and radiated to the left leg.  *See id.* at 497.  Plaintiff reported weakness in both legs and numbness in his left, and further reported difficulty getting out of bed.  *See id.*  Plaintiff continued to use a cane.  *See id.*  On examination, Dr. Khan found Plaintiff unable to heel and toe walk, and that he had moderate to severe superficial tenderness of the lumbar paraspinal muscles and gluteal muscles.  *See id.* at 498.  He found Plaintiff's range of motion of the spine was limited in flexion,

extension, lateral bending, and rotation. Plaintiff's Patrick's test and lumbar facet loading tests were positive, and Plaintiff's diagnoses continued to be lumbar facet arthropathy, lumbar radiculopathy, and lumbar spondylosis. *See id.* Dr. Khan increase Plaintiff's Cymbalta and prescribed etodolac for pain. *See id.*

On September 8, 2009, Plaintiff treated with Dr. Goldiner at Slocum-Dickson medical group per the referral of Dr. Khan for severe back pain. *See id.* at 495. On examination, Dr. Goldiner found Plaintiff had decreased muscle strength in his lower left extremity, and the EMG conducted during the treatment revealed evidence of L5-S1 radiculopathy. *See id.* at 496. Dr. Goldiner prescribed Flexeril and referred Plaintiff to Dr. Buckley for surgical intervention and told Plaintiff to continue with Dr. Khan for pain management. *See id.*

On January 18, 2010, Plaintiff treated with Dr. Buckley and reported worsening back pain. T 476. Dr. Buckley noted pain management told Plaintiff not much more can be done. *See id.* at 476. Dr. Buckley noted that an MRI was positive for L5-S1 degeneration and spinal stenosis. *See id.* There was also "L4-L5 internal disk disruption, foraminal stenosis only, with L4 through S1 internal disk disruption." *Id.* Dr. Buckley drafted a letter to Dr. Khan indicating that he was sending Plaintiff back to Dr. Khan for evaluation for L3 to S1 discograms to find out which level was causing pain. *See id.* at 522.

On February 2, 2010, Dr. Khan performed a lumbar provocative discography with post-discography multiplanar computerized tomography ("CT"). *See id.* at 488. The findings included the following: at the L3-L4 level the pain response was "partial concordant pain right side low back, 8/10 on the visual analog scale . . . the postdiscogram CT scan [was] suggestive of a grade 1 tear;" at the L4-L5 level the pain response was "partial concordant pain center and right lower back, 9/10 on the visual analog scale . . . . [The] post-discogram CT scan showed suspicion

of a grade 4 tear at the L4/5 level;" at the L5-S1 level the pain response was "concordant pain center and right lower back and left leg, 10/10 on the visual analog scale . . . . [The] post-discogram CT scan showed suspicion of a grade 5 tear at the L5/S1 level with associated suspected disc herniation in the left paracentral region with posterior displacement and impingement on the left-sided L5 nerve root." *Id.* at 490. Dr. Khan assessed at L5-S1 there was "severe internal disc derangement." *Id.* at 490-91.

On March 16, 2010, Plaintiff treated with Dr. Buckley who noted Plaintiff was prescribed a TENS unit and his discogram showed "concordant pain at L5-S1 with 10/10 pain." *Id.* at 475. Dr. Buckley planned to conduct another MRI. *See id.* at 475. On March 18, 2010, P.A. Berry (who worked with Dr. Buckley) prescribed Plaintiff a cane for L5-S1 degeneration and spinal stenosis. *See id.* at 541. On March 26, 2010, and MRI revealed a "small to moderately sized central and left paracentral L5-S1 disc herniation producing posterior displacement of the left S1 nerve root." *Id.* at 521. There was also a lateral T11-T12 disc herniation and mild L4-L5 disc bulging "with mild degenerative facet changes at multiple levels." *Id.*

On March 25, 2010 and May 7, 2010, Plaintiff treated with Dr. Khan for pain management of his low back pain that radiated into his left leg. *See id.* at 477, 479. Dr. Khan noted that Dr. Buckley had given Plaintiff a prescription for a cane. *See id.* at 479. On May 7, 2010, Dr. Khan diagnosed Plaintiff with lumbar radiculopathy, lumbar spondylosis, and "lumbar IDD." *See id.* at 478. Dr. Khan planned to perform an epidural steroid injections for severe left leg and calf pain. *See id.*

On June 14, 2010, Dr. Khan completed a medical source statement outlining Plaintiff's impairments resulting from lumbar radiculopathy. *See id.* at 512. Dr. Khan opined Plaintiff was incapable of performing low stress jobs due to difficulty he would have sitting in one position.

*See id.* He opined that Plaintiff could walk three-to-four city blocks without rest or severe pain. *See id.* Dr. Khan further opined that Plaintiff had the following limitations: he could sit at one time for forty-five minutes and a total of four hours in an eight-hour workday; he could stand at most for fifteen minutes total and could not stand a total of two hours in an eight-hour workday; he would need a job permitting shifting positions at will from sitting, standing or walking; he would need unscheduled breaks every thirty minutes lasting fifteen minutes in duration during the eight-hour workday; he would need the use of an assistive device like a cane; he could occasionally lift/carry less than ten pounds and rarely lift ten pounds; he could never look down, turn his head, look up, hold his head in a static position, twist, stoop (bend), crouch/squat, climb ladders or stairs; he could frequently use his fingers for fine manipulation and his arms to reach overhead; he would have good and bad days; he would miss about three days of work per month as a result of his impairments and treatment; and his symptoms would frequently interfere with his attention and concentration impacting his ability to perform even simple work tasks. *See id.* at 512-14.

On September 14, 2010, Plaintiff treated with Dr. Buckley for a pre-surgical consultation for his back pain and left leg pain. *See id.* at 572. Dr. Buckley noted that he advised Plaintiff for L5-S1 decompression, posterior and transforaminal lumbar interbody fusion, but that Plaintiff's insurance company would only pay for a limited discectomy procedure for his leg pain. *See id.* Dr. Buckley informed Plaintiff that, because of this, his procedure would only help his leg pain and not his back pain. On September 23, 2010, Plaintiff underwent L5-S1 "minimally invasive hemilaminectomy, discectomy, foraminotomy, and fluoroscopic interpretation" for left leg S1 radiculopathy. *See id.* at 569.

On December 2, 2010, following his surgery, Plaintiff was seen by Dr. Buckley for a follow-up evaluation. *See id.* at 561. In his notes discussing the evaluation, Dr. Buckley stated the following:

> The patient overall feels significant reduction in his leg symptoms versus preoperative symptoms. Most of the pain is gone. He denies weakness. He denies footdrop. He denies swelling. He denies tingling. He is ambulating well. He is also complaining of aching in his back. He has been taking Flexeril and Cymbalta. He does not like to take narcotics. They do not help him. We did want to have a fusion done for his back but this was denied by the insurance. As a result, he has continuation of pain, as we had told him preoperatively. . . . He has been using a cane at times for ambulation.

*Id.*

On April 11, 2011, Plaintiff treated with psychiatrist Stephen Hadyncia, M.D., after referring himself to mental health connections for anxiety and depression. *See id.* at 550-52. Plaintiff reported his history of foster homes and that he had become verbally abusive towards others. *See id.* at 551. Dr. Hadyncia noted Plaintiff was using a cane. *See id.* at 550. On examination, Dr. Hadyncia found Plaintiff irritable, that he stimulated himself with aggressive behavior, and that he talked "incessantly." *Id.* Dr. Hadyncia diagnosed Plaintiff with depressive disorder, PTSD, and anti-social behavior. *See id.* at 551. Plaintiff continued treatment with Dr. Hadyncia on May 9, 2011, June 6, 2011, September 6, 2011, and December 12, 2011. *See id.* at 542-49. Dr. Hadyncia prescribed, among other things, Lexapro at each visit. *See id.* at 542-51.

On January 19, 2012, Dr. Hadyncia completed a medical source statement outlining Plaintiff's limitations resulting from depressive disorder, PTSD and antisocial behavior. *See id.* at 555. Dr. Hadyncia noted Plaintiff's symptoms included emotional withdrawal or isolation, thoughts of suicide/harming others, deeply ingrained maladaptive patterns of behavior, and pathological dependence. *See id.* He opined that Plaintiff was unable to meet competitive

standards with respect to the mental abilities and aptitudes needed to do unskilled work with respect to the following: sustaining an ordinary routine without supervision; working in coordination with or in proximity to others without being unduly distracted; completing a normal workday and workweek without interruptions from psychologically based symptoms; and dealing with normal work stress. *See id.* at 556. Dr. Hadyncia noted that this was a result of Plaintiff's depressive symptoms, anxiety, and personality disorder. *See id.* He opined Plaintiff would be off-task more than twenty percent of the workday given his impairments and that he would miss two days of work per month as a result of his treatments and impairments. *See id.* at 557.

## III. DISCUSSION

### A.    Standard of Review

For purposes of both DIB and SSI, a person is disabled when he is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)).

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether a plaintiff is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Court must examine the Administrative Transcript to ascertain whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *See Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

**B.     The ALJ's decision**

At step one of the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the date he applied for SSI. *See* R. at 18. At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar

spine, depressive disorder, and personality disorder.  *See id.* at 19.[2]  At the third step, the ALJ

found that Plaintiff did not have an impairment or combination of impairments that meets or

medically equals an impairment listed in the Listing of Impairments at 20 C.F.R. Part 404,

Subpart P, Appendix 1.  *See id.* at 20-21.  The ALJ specifically considered the criteria of Listings

1.04 (disorders of the spine), 12.04 (affective disorders), 12.06 (anxiety related disorders), and

12.08 (personality disorders).  *See id.*

The ALJ then found that Plaintiff retained the RFC to perform the exertional requirements

of sedentary work, as defined in 20 C.F.R. § 416.967(a), in that the Plaintiff could: lift and/or

carry ten pounds occasionally; sit for six hours in an eight-hour workday; and stand and/or walk

for two hours in an eight-hour workday.  *See* R. at 21.  The ALJ also assessed a variety of

non-exertional abilities and limitations attributed to Plaintiff's mental impairments.  *See id.*[3]

At the fourth step, the ALJ found that Plaintiff was unable to perform his past relevant

work.  *See id.* at 27.  Proceeding to step five, the ALJ solicited the testimony of a vocational

expert.  *See id.* at 28-29, 53-55.  The vocational expert testified that a hypothetical individual of

Plaintiff's age, with his education, past relevant work experience, and RFC (as described above),

could perform the representative occupation of table worker, classified by the U.S. Department of

---

[2] The ALJ found that the Plaintiff's neck impairment and history of drug use were not severe impairments, as there was no indication in the record that these conditions caused more than minimal work-related limitations.  *See* R. at 19-20; *see also* 20 C.F.R. § 416.921(a).

[3] The ALJ found that Plaintiff could understand and follow simple instructions and directions, perform simple tasks with supervision and independently, maintain attention and concentration for simple tasks, regularly attend to a routine, maintain a schedule, and relate to and interact with others, to the extent necessary to carry out simple tasks.  *See* R. at 21.  However, he found that Plaintiff should avoid contact with the public.  *See id.*  He also found that Plaintiff could handle reasonable levels of simple work-related stress, in that he could make occasional simple decisions directly related to the completion of tasks in a stable, unchanging work environment.  *See id.*

Labor's Dictionary of Occupational Titles ("DOT") as job number 739.687-182, with 410,759 jobs existing nationally, 18,400 jobs existing in the State of New York, and 450 jobs existing in the city of Utica and surrounding suburban areas. *See id.* at 53-55. The ALJ relied on this testimony and used Medical-Vocational Rule 201.25, set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2, as a framework in determining that Plaintiff was not disabled. *See id.* at 28-29.

## C.    Analysis

In his motion for judgment on the pleadings, Plaintiff raises the following arguments: (1) the ALJ's residual functional capacity determination is unsupported by substantial evidence because the ALJ erred in according inadequate weight to the opinion from treating physician Dr. Khan and erred by relying on the vague opinion from consultative examiner Dr. Ganesh; (2) the ALJ's credibility determination is unsupported by substantial evidence because the ALJ erred in analyzing the required factors when assessing Plaintiff's credibility; and (3) the ALJ's Step 5 determination is unsupported by substantial evidence because the ALJ relied upon an incomplete hypothetical question asked to the vocational expert. *See* Dkt. No. 11 at 17-27.

### 1. The ALJ's RFC determination is supported by substantial evidence

In support of his first point, Plaintiff contends that the ALJ erred in his RFC determination by according inadequate weight to the opinion of Plaintiff's treating physician, Dr. Khan. *See* Dkt. No. 11 at 18-24. Further, Plaintiff argues that the ALJ erred in relying on the vague opinion from Dr. Ganesh, the consultative examiner. *See id.*

Under the Regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Rosa v. Callhan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). An ALJ may refuse to consider the treating physician's opinion only if he is able to set forth good reason for doing so. *See Saxon v. Astrue*, 781 F. Supp. 2d 92, 102 (N.D.N.Y. 2011) (citation omitted). The less consistent an opinion is with the record as a whole, the less weight it is to be given. *See Otts v. Comm'r of Soc. Sec.*, 249 Fed. Appx. 887, 889 (2d Cir. 2007) (holding that an ALJ may reject such an opinion of a treating physician "upon the identification of good reasons, such as substantial contradictory evidence in the record") (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)).

The opinion of a treating physician is not afforded controlling weight where the treating physician's opinion contradicts other substantial evidence in the record, such as the opinions of other medical experts. *See Williams v. Comm'r of Soc. Sec.*, 236 Fed. Appx. 641, 643-44 (2d Cir. 2007) (quotation and other citation omitted); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citing 20 C.F.R. § 404.1527(d)(2)). "While the final responsibility for deciding issues relating to disability is reserved to the Commissioner, the ALJ must still give controlling weight to a treating physician's opinion on the nature and severity of a plaintiff's impairment when the opinion is not inconsistent with substantial evidence." *Martin v. Astrue*, 337 Fed. Appx. 87, 89 (2d Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)).

When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including: (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors

brought to the Social Security Administration's attention that tend to support or contradict the opinion.  *See* 20 C.F.R. § 404.1527(c); *Shaw*, 221 F.3d at 134.  "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citation omitted).

In his evaluation of Plaintiff, Dr. Khan believed that Plaintiff could sit for no more than forty-five minutes at a time, and for a total of about four hours in an eight-hour workday.  *See* R. at 512.  Dr. Khan asserted that Plaintiff could stand for no more than fifteen minutes at a time, and for a total of less than two hours in an eight-hour workday.  *See id.*  He stated that Plaintiff would need to take unscheduled breaks every thirty minutes, and he believed that Plaintiff experienced a variety of postural limitations.  *See id.* at 513.  Dr. Khan estimated that Plaintiff would miss work about three days per month, and that his pain and other symptoms would frequently interfere with his ability to concentrate.  *See id.* at 514.

Contrary to Plaintiff's assertions, the ALJ properly analyzed Dr. Khan's opinion and provided good reasons, supported by substantial evidence, for discounting it.  As the ALJ noted, Dr. Khan's conclusions were inconsistent with the clinical and diagnostic findings contained in his own treatment notes.  Specifically, the ALJ provided the following examples:

> Notably, Dr. Khan's treatment notes refer to the MRI findings as a 'small' disc herniation at the L5-S1 level 'minimally' touching the left S1 nerve root (Exhibit B13F, p. 28).  Such minimal diagnostic findings do not support his restrictive opinion.  Moreover, as noted previously, the claimant consistently put forth very poor effort during examinations (Exhibits B2F and B13F).  Moreover, some of the limitations referred to by Dr. Khan are not logically related to the claimant's medically determinable back impairment.  For instance, the inability to look down, turn his head right or left, or hold his head in a static position are not limitations that one would expect to find in an individual who has a herniated disc at the L5-S1 level, the lowest level of the lumbar spine.  While Dr. Khan indicated that the claimant needs a cane to ambulate, he did not

prescribe the cane. Rather, the claimant borrowed the cane from his girlfriend's grandmother (Exhibit B2F, p. 37).

*See* R. at 24-25.

Physical examinations performed by Dr. Khan from December 12, 2008 through May 7, 2010, point to a similar conclusion. Dr. Khan repeatedly observed moderate to severe tenderness of Plaintiff's lumbar paraspinal and gluteal muscles, as well as his left sacroiliac joint, resulting in reduced spinal range of motion and a noticeable limp. *See id.* at 22, 362, 365, 370, 478, 480, 484, 492, 498, 501, 504. Dr. Khan repeatedly observed that Plaintiff was sitting during in "no acute distress" during the examinations. *Id.* at 480, 484, 492, 498, 501, 504. On examination, Plaintiff's straight leg raising tests were routinely negative bilaterally. *See id.* On neurological examination, Plaintiff's reflexes were generally normal (2+/4), and sensation remained intact to light touch and pin prick. *See id.* A Babinski test was repeatedly negative. *See id.* Plaintiff consistently had full strength (5/5) in his arms. *See id.* Additionally, as the ALJ correctly noted, Dr. Khan repeatedly noted that some of the physical examinations were not only limited because of Plaintiff's complaints of pain, but also due to "lack of effort." *Id.* at 478, 480, 484, 492, 498, 501, 504.

Further, the ALJ noted that PA Berry, who works for Dr. Khan, advised Plaintiff on October 11, 2010 to avoid bending, twisting, sitting more than twenty-to-thirty minutes, and heavy lifting. *See id.* at 25 (citing Exhibit B20F, p. 8). The ALJ gave this opinion little weight because it was not provided by an "acceptable medical source" and because it was issued only two weeks after Plaintiff's back surgery. *See id.* The ALJ properly gave this opinion little weight. As he noted, the opinion was inconsistent with the opinion of Plaintiff's treating surgeon, Dr. Buckley, which was issued in December of 2010. *See id.* Further, as the ALJ noted, PA

Berry's opinion did not reflect Plaintiff's limitations prior to his surgery or after he healed from his surgery. *See id.*

The ALJ noted other inconsistencies between Dr. Kahn's treatment notes and his functional assessment. *See id.* at 25. As the ALJ explained, certain of the limitations assessed by Dr. Khan bore no logical relationship to Plaintiff's documented back impairment, or to any other condition noted in Dr. Kahn's treatment records. *See id.* For example, the ALJ noted that Dr. Khan asserted that Plaintiff could never look down, turn his head right or left, look up, or hold his head in a static position. *See id.* at 25, 513. Yet Dr. Khan had consistently diagnosed conditions relating only to Plaintiff's lumbar spine, never noting any positive clinical finding with regard to Plaintiff's neck or cervical spine. *See id.* at 25, 362, 365, 370, 478, 480, 484, 492, 498, 501, 504. Rather, Dr. Khan repeatedly found no abnormalities on examination of Plaintiff's neck. *See id.*

In support of his position, Plaintiff directs the Court to a March 26, 2010 medical record in which Dr. John J. Picano reported to Dr. Buckley that at "T11-12 . . . there is a small left lateral and far lateral disc protrusion producing minimal attenuation of the origin of the left T11-12 foramen." *See* R. at 520; *see also* Dkt. No. 11 at 23. The report also notes that "there is mild L4-5 disc bulging with mild degenerative facet changes at multiple levels[.]" *Id.* Again, however, this report provides little, if any, support for Dr. Khan's conclusion that Plaintiff could never look down, turn his head right or left, look up, or hold his head in a static position. *See id.* at 25, 513. Plaintiff's mild disc protrusion at the T11-12 level – the two thoracic vertebrae closest to the lumbar vertebrae – would not explain Dr. Khan's these supposed limitations.

Moreover, although Plaintiff's records indicate varying degrees of tenderness in his lower back, with reduced range of motion at times, Plaintiff did not exhibit spasms or neurological abnormality during his physical examinations. *See* R. at 524, 527-29, 532-33, 536-37, 540. The

ALJ also discussed other substantial evidence that contradicted the opinion of Dr. Khan. For example, the ALJ noted that when Plaintiff was examined by Dr. Buckley on July 1, 2008, he found that Plaintiff had no obvious significant nerve entrapment to account for muscle weakness. *See id.* at 22, 372. On examination, Plaintiff's legs showed full range of motion, without pain or restriction. *See id.* at 372. Plaintiff did show some symptomology of lower back pain, including a limp and an inability to walk on his heels and toes. *See id.* A straight leg test was positive on the right, to sixty degrees, though negative on the left. *See id.* at 373. A neurological examination, however, revealed normal sensation to light touch and his "[m]otor weakness appear[ed] to be secondary to poor effort from pain." *Id.*

Additionally, the ALJ noted Plaintiff's substantial level of functioning following his spinal discectomy on September 23, 2010. *See id.* at 24, 569-71. When Dr. Buckley examined Plaintiff on October 11, 2010, Plaintiff reported that "at least 50 to 80 percent of his previous pain and numbness in his left leg are gone." *Id.* at 565. Plaintiff still reported "some back pain" but Dr. Buckley noted that Plaintiff was "showing significant improvement overall." *Id.*

When Plaintiff returned for a follow-up on August 10, 2011, Dr. Buckley noted that, although Plaintiff continued to report some pain, he had been doing some walking and was "doing better than he was at his last visit so he will continue to do his activities as tolerated." *Id.* at 558. Plaintiff admitted that Cymbalta and Flexeril help when he experiences pain. Plaintiff had no muscle tenderness or spasm on palpation. *See id.* While Plaintiff had decreased range of motion in his lumbar spine, passive and active range of motion remained intact in all extremities. *See id.* Further, Dr. Buckley noted that, although he does use a cane, his gait was "symmetrical without limp." *Id.* As the ALJ noted, although Dr. Buckley recommended that Plaintiff avoid heavy

lifting, pushing, pulling, and repetitive bending, he provided no restrictions for walking, standing or sitting. *See id.* at 24, 558-59.

As Defendant correctly contends, the ALJ properly assigned considerable weight to Dr. Buckley's opinions regarding Plaintiff's functional abilities, based on the nature of the treatment relationship and the doctor's detailed clinical examination findings. *See id.* at 24; *see also* 20 C.F.R. § 416.927(d)(2)-(3). The ALJ acknowledged that these opinions related to Plaintiff's functional abilities only after his surgery in September of 2010, and were of limited probative value in determining Plaintiff's functional limitations before that time. *See* R. at 24. The ALJ recognized that Plaintiff's limitations were more restrictive prior to his surgery, and took that into account when formulating his RFC assessment. *See id.* Even so, Plaintiff's high level of post-surgical functioning is significant, as Plaintiff only underwent a limited discectomy procedure, intended to relieve his leg pain, but not his back pain. *See id.* at 572. Plaintiff's high level of functioning, despite continuing to experience some back pain, stands in sharp contrast to the extreme functional limitations assessed by Dr. Khan. *See id.* at 512-14.

The fact that the ALJ did not specifically refer to the results of a February 8, 2010 discography of Plaintiff's lumbar spine does not mandate a different result. *See* Dkt. No. 11 at 21-22. The rationale for the ALJ's decision is clear from the record and he was not required to reconcile or discuss this one piece of potentially conflicting evidence, as Plaintiff contends. *See Morgeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983). The mixed results of this discography revealed mixed results at best and does not "overwhelmingly support" the limitations assessed by Dr. Kahn. Whether the mixed results of the discography could be read to support Dr. Khan's assessment is not the appropriate test. Rather, since the Court finds that the ALJ's decision is

supported by substantial evidence, the ALJ's decision must be upheld. *See DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998).

In determining Plaintiff's RFC, the ALJ properly relied upon the opinions of the consultative examiner, Dr. Kalyani Ganesh, who concluded that Plaintiff had no gross limitations for sitting, the most significant component of sedentary work under the Commissioner's regulations. *See* R. at 25, 441; *see also* 20 C.F.R. § 416.967(a). Similarly, Dr. Ganesh believed that Plaintiff had no limitations for use of his arms and hands, and he opined that Plaintiff had only moderate limitations for standing, walking, climbing, lifting, carrying, pushing, pulling, and bending. *See* R. at 25, 441. The ALJ properly afforded considerable weight to Dr. Ganesh's opinions because they were supported by his detailed clinical examination findings. *See* 20 C.F.R. § 416.927(d)(3) (providing that the more a medical source presents relevant evidence to support an opinion, the more weight that opinion will be given).

Dr. Ganesh examined Plaintiff on June 5, 2009. *See* R. at 438-41. As the ALJ noted, although Plaintiff did experience some difficulty ambulating during this examination, he needed no help changing for the examination or getting on and off the examination table, and he was able to rise from a chair without difficulty. *See id.* at 23, 439. A musculoskeletal examination revealed full range of motion of the cervical spine, and no evident deformity or abnormality in the thoracic spine. *See id.* at 23, 440. As the ALJ acknowledged, Plaintiff did have somewhat limited range of motion of the lumbar spine and hips. *See id.* However, a straight leg raising test was negative bilaterally. *See id.* Plaintiff had full strength (5/5) in his right leg, and nearly full strength (4/5) in his left leg. *See id.* at 440. Moreover, Plaintiff had full range of motion in his shoulders, elbows, forearms, wrists, and ankles bilaterally. *See id.* All of Plaintiff's joints were stable and non-tender. *See id.* Plaintiff retained full strength (5/5) in both arms, as well as full

grip strength (5/5) and hand and finger dexterity.  *See id.*  A neurological examination revealed equal reflexes and no motor or sensory deficits.  *See id.*  Dr. Ganesh also noted that no muscle atrophy was evident.  *See id.*

Moreover, as the ALJ aptly noted, Dr. Ganesh's opinion was not only supported by his clinical and diagnostic findings, but was also consistent with the diagnostic imaging results throughout the administrative record.  *See id.* at 25; *see also* 20 C.F.R. § 416.927(d)(4) (noting that the more consistent an opinion is with the record as a whole, the more weight it will be given).  These imaging results included the MRI discussed above, revealing only minimal nerve root impingement.  Additionally, x-rays of Plaintiff's sacroiliac joints, taken July 1, 2008, revealed no abnormalities.  *See* R. at 374, 518.  X-rays of Plaintiff's lumbar spine, taken on the same date, revealed no acute findings and only minor degenerative changes at the L5-S1 level. *See id.* at 375, 519.  Similarly, an MRI of Plaintiff's lumbar spine on March 26, 2010 revealed only a small to moderately sized disc herniation at L5-S1, which produced displacement of the nerve root sleeve, but without compressing it against the facet joint.  *See id.* at 520-21, 581-82. That same MRI revealed only a small disc herniation at T11-12 and only a mild disc bulging at L4-5, with degenerative facet changes that were similarly mild in degree.  *See id.*

Based on the foregoing, the Court finds that the ALJ's RFC determination was supported by substantial evidence and that he afforded the appropriate amount of weight to the decision of Plaintiff's treating physician.

### 2. The ALJ properly analyzed Plaintiff's credibility

Plaintiff next argues that the ALJ erred in finding him not entirely credible.  *See* Dkt. No. 11 at 24-26.  Specifically, Plaintiff contends that the ALJ erred in concluding that Plaintiff is able

to dress and manage his own funds because (1) "Plaintiff testified twice he needed help putting his socks and shoes on[;]" and (2) "Dr. Barry opined Plaintiff would need assistance in managing his own funds." *Id.* at 25 (citing R. at 43, 78, 436). Next, Plaintiff asserts that the ALJ failed to consider the side-effects of his medications. *See id.* Specifically, Plaintiff argues that he "testified the pain relievers and muscle relaxers he takes for his back cause him to be very moody, crank[y], and make[ ] him snap very easily at people." *Id.* (citing R. at 47). Finally, Plaintiff contends that the ALJ improperly considered a physical therapist's note prior to the application, in which the therapist expressed doubt over Plaintiff's need for a cane. *See id.* at 26 (citing R. at 24).

"The ALJ has discretion to assess the credibility of a claimant's testimony regarding disabling pain and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. The ALJ must consider statements the claimant or others make about his impairments, his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quotations and citations omitted).

If a plaintiff's testimony concerning the intensity, persistence or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must

consider additional factors in order to assess that testimony, including: (1) daily activities; (2) location, duration, frequency, and intensity of any symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness and side effects of any medications taken; (5) other treatment received; and (6) other measures taken to relieve symptoms. 20 C.F.R. §§ 416.929(c)(3)(i)-(vi). The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether the plaintiff's statements about the intensity, persistence, or functionally limiting effects of his symptoms are consistent with the objective medical and other evidence. *See* SSR 96-7p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186, *2 (Soc. Sec. Admin. Jul. 2, 1996). One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the record. *Id.* at *5.

"After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony." *Saxon v. Astrue*, 781 F. Supp. 2d 92, 105 (N.D.N.Y. 2011) (citing, *inter alia*, 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)). An ALJ rejecting subjective testimony "'must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence.'" *Melchior v. Apfel*, 15 F. Supp. 2d 215, 219 (N.D.N.Y. 1998) (quoting *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)). The Commissioner may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence, the lack of medical treatment, and her own activities during the relevant period. *See Howe-Andrews v. Astrue*, No. CV-05-4539, 2007 WL

1839891,*10 (E.D.N.Y. June 27, 2007). With regard to the sufficiency of credibility determinations, the Commissioner has stated that

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186, at *2.

In the present matter, the ALJ first found that Plaintiff's medically determinable impairments could reasonably be expected to produce his alleged symptoms. *See* R. at 22. However, the ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent alleged. *See id.*

The ALJ also noted that Plaintiff's insubstantial work history called into question his motivation to work, even before his alleged onset date. *See id.* at 23. Moreover, the ALJ noted that Plaintiff never attempted any vocational training and never tried working in a sedentary position. *See id.*; *see also* 20 C.F.R. § 416.929(a) (noting that an individual's efforts to work may constitute evidence of the credibility of his reported symptoms).

Additionally, in evaluating Plaintiff's credibility, the ALJ pointed to inconsistencies in Plaintiff's statements regarding his drug use, which called his honestly into question. See SSR 96-7p ("[O]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record"). For example, on April 6, 2009, after Plaintiff tested positive for cannabis, he denied that he had engaged in illegal drug use, proffering an implausible excuse in an effort to procure prescription narcotics. *See* R. at

24 ("The claimant denied using marijuana and explained that the positive test may have been from him walking near someone who was smoking marijuana. . . . No surprisingly, his doctor did not accept his explanation"); *see also id.* at 530-31.

The ALJ also noted that Plaintiff had been uncooperative in his treatment regimen. *See* SSR 96-7p (providing that "an individual's statements may be less credible if . . . the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure"). For example, on August 15, 2008, when physical therapist Becky Rupert attempted to instruct Plaintiff on proper use of his cane, Plaintiff was unwilling to accept her suggestion. *See* R. at 24, 397. At the following session, when physical therapist Brian Ruppert suggested that Plaintiff work to condition his muscles rather than relying on the cane, Plaintiff became "disgusted" and left without being treated. *See id.* at 24, 396.

The ALJ also considered Plaintiff's daily activities, as required under the regulations. As the ALJ explained, when Plaintiff was consultatively examined by psychologist Kristen Barry on June 5, 2009, Plaintiff reported that he could dress, bathe, and groom himself independently. *See id.* at 20, 435. With help, Plaintiff could do some cooking, cleaning, and laundry. *See id.* Similarly, Plaintiff told Dr. Ganesh that he could cook a couple of times a week, and that he could shower and dress daily, with some help. *See id.* at 439. The ALJ properly concluded that such activities indicated only mild restriction, not commensurate with Plaintiff's subjective allegations of completely disabling symptoms that precluded even sedentary work. *See id.* at 20, 22.

Based on the foregoing, the Court finds that the ALJ properly used his discretion in evaluating Plaintiff's credibility in view of the medical findings and other evidence. *See Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984).

***3. The ALJ properly found that Plaintiff was not disabled at Step Five of the Sequential Evaluation***

In his motion, Plaintiff contends that the ALJ's Step Five determination is unsupported by substantial evidence "because the ALJ relied upon an incomplete hypothetical question asked to the vocational expert." Dkt. No. 11 at 26-27. At the hearing, the ALJ asked the vocational expert whether jobs exist in the national economy for an individual with Plaintiff's age, education, work experience, and residual functional capacity. *See* R. at 28. The vocational expert testified that, given the above factors, Plaintiff would be able to perform the requirements of "representative occupations such as table worker." *Id.* The vocational expert testified that this is a sedentary job that does not involve public contact. *See id.* In response to questioning from Plaintiff's representative, the vocational expert indicated that these jobs are simple unskilled entry level manufacturing jobs that do not require a high school education or GED. *See id.* The vocational expert also testified that the fact that an individual needed to use a cane would not significantly impact his ability to perform this work, explaining that this is typically a sit down, bench assembly type job and that the individual would rarely need to get up. *See id.*

"At Step Five, the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v)). "An ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *McIntyre*, 758 F.3d at 151. "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion,' . . . and accurately reflect the limitations and capabilities of the claimant involved[.]" *Id.* (internal quotation and other citation omitted).

In the present matter, the ALJ provided the vocational expert with Plaintiff's physical and mental abilities in posing his hypothetical question. *See* R. at 53-54. Using this information, the vocational expert indicated that Plaintiff would be suitable for a sedentary occupation and provided considerable details regarding the available jobs in the State of New York, and more locally in the Utica area. *See id.* at 54-55. Since there was substantial evidence in the record supporting the assumptions upon which the hypothetical question was based, the ALJ properly relied on the vocational expert's testimony in response to the hypothetical question. *See McIntyre*, 758 F.3d at 151-52. Even if the ALJ failed to incorporate all of Plaintiff's exertional limitations in the posed hypothetical question, the Court finds that such an error would have been harmless. *See id.* at 152 (holding "that an ALJ's failure to incorporate non-exertional limitations in a hypothetical (that is otherwise supported by evidence in the record) is harmless error if (1) 'medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace,' and the challenged hypothetical is limited 'to include only unskilled work'; or (2) the hypothetical 'otherwise implicitly account[ed] for a claimant's limitations in concentration, persistence, and pace'") (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)).

Based on the foregoing, the Court finds that the ALJ properly found that Plaintiff was not disabled at Step Five of the Sequential Evaluation.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for judgment on the pleadings (Dkt. No. 13) is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's motion for judgment on the pleadings is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: October 9, 2014
       Albany, New York

Mae A. D'Agostino
U.S. District Judge